FLORENCE P. SPOFFORD *et al. v.* S. C. ROSE *et al.*

(*Nashville.*   December Term, 1921.)

1. **DESCENT AND DISTRIBUTION.** Land inherited by intestate
   from sister was ''acquired'' by her, within statute of descent.
   Land inherited by intestate from her sister was "acquired" by her,
   within Shannon's Code, section 4163, subsec. 2, and on her death,
   unmarried, without issue and without surviving parents or
   brothers or sisters, passed one-half to the heirs of the father and
   one-half to the heirs of the mother, under subdivision "c." (*Post,*
   *p.* 592.)

2. **DESCENT AND DISTRIBUTION.** Maternal grandfather's kindred
   not ''heirs'' of mother, within statute of descent.
   Where intestate died single and without surviving parents or
   brothers and sisters, land received by intestate as a gift from her
   maternal grandfather vested in the grandchildren of the mother s
   deceased brothers and sisters, under Shannon's Code, section 4163,
   subsec. 3, subd. "c," providing that in such case the land shall
   pass to the "heirs of the parent from whom or whose ancestor it
   came," to the exclusion of the maternal grandfather's collateral
   kindred; since the word "heirs," when used relative to real
   estate, has reference to persons appointed by law to succeed to the
   real estate in case of intestacy, and since the grandchildren of the
   mother's brother and sister were the heirs, under section 4164,
   because of death of the brother and sister, who would otherwise
   have been the heirs, and the death of the children of such brother
   and sister. (*Post, pp.* 592-596.)

Acts cited and construed: Acts 1784, ch. 22, sec. 7; Acts 1841, ch.
   171, sec. 1.

Cases cited and approved: Towls v. Rains, 49 Tenn., 356; Beaumont
   v. Irwin, 34 Tenn., 291; Alexander y. Wallace, 76 Tenn., 569;
   Swanson v. Swanson, 32 Tenn., 446; Gosling v. Caldwell, 69 Tenn.,

455;  Paine v. Gupton, 30 Tenn., 402;  Ware v. Sharp, 31 Tenn.,
490;  Forrest v. Porch, 100 Tenn., 391;  Barnes v. Redmond, 127
Tenn., 45.

Code cited and construed:  Sec. 4164 (S.).

3. **TRUSTS.** Grantee presumed to hold land in trust for person who
paid consideration.

Where land is conveyed to one person, though consideration is paid
by another, it will be presumed that the grantee holds the proper-
ty in trust for person who paid the consideration.  (*Post*, p. 596.)

Case cited and approved:  Dudley v. Bosworth, 29 Tenn., 12.

4. **DESCENT AND DISTRIBUTION.** Equitable interest as well as
legal title passes by descent.

Where husband held legal title in trust for wife, property, on death
of daughter to whom property had descended, passed to the heirs
of the wife instead of to the heirs of the husband, since under
the statute all interest passes by descent, whether legal or equi-
table.  (*Post, pp.* 597, 598.)

Cases cited and approved:  McKinney v. Stacks, 53 Tenn., 290;
Alexander v. Miller's Heirs, 54 Tenn., 65.

5. **TRUSTS.** Trustee presumed to have acted in conformity with the
authority vested in him.

A trustee, in expending money out of the personal estate for im-
provement of the real estate, will be presumed to have acted in
conformity with the power and authority vested in him as trustee.
(*Post, pp.* 598-601.)

6. **TRUSTS.** Court had power to appoint successor of trustee, even
if not empowered by will to so do.

The court had power to appoint a successor to testamentary trustee,
even if it had not been empowered by the will to so do.  (*Post,
pp.* 598-601.)

7. **CONVERSION.** Real estate acquired on court's investment of funds
of non compos who died intestate without regaining her reason
passes as personalty.

Spofford v. Rose.

Where a court lawfully invests the funds of a *non compos* in real property and the *non compos* dies intestate, never having regained her reason, the real property so acquired passeses as personalty and not as realty. (*Post, pp.* 601-607.)

Cases cited and approved: Rogers v. Clark, 37 Tenn., 665; Jones v. Walkup, 37 Tenn., 135; Smalling v. King, 73 Tenn., 590; Cowden v. Pitts, 61 Tenn., 60; Ex parte Moore and Wife, 40 Tenn., 171; Wayne v. Fouts, 108 Tenn., 153; Singleton v. Love, 38 Tenn., 357; Ex parte Phillips, 19 Ves., 123; Snowhill v. Snowhill, 3 Green's ch. 20; Oberle v. Lerch, 3 C. E. Green's ch., 346.

Case cited and distinguished: Paul v. York, 1 Tenn., ch., 560; Matter of McMillan, 126 App. Div., 155; McClain v. McClain, Ann. Cas., 1915a, 158; Pickens' Ex'rs v. Kniseley, 36 W. Va., 794; Oberly v. Lerch, 18 N. J. Eq., 346.

8  CONVERSION.  Trustee's expenditure of funds in improvement of real estate a conversion, though beneficiary was non compos.

Where testator directed trustee to improve real estate, the investment or expenditure of funds in improving the property was a conversion, so as to pass as realty on beneficiary's death intestate, though beneficiary was *non compos*, since even if beneficiary had become sane she would have had no voice in the matter. (*Post, pp.* 607-611.)

Case cited and approved: Todd v. Superior Court, 181 Cal., 406.

9. ATTORNEY AND CLIENT.  Clients may change counsel at any time.

Generally, clients have the right to change attorneys at any time, and to substitute other counsel during the further progress of the litigation, which right does not preclude discharged counsel from recovering compensation. (*Post, pp.* 611-613.)

10. APPEAL AND ERROR.  Concurrent finding of fact by chancellor and court of civil appeals conclusive.

The supreme court is bound by the concurrent finding of the chancellor and the court of civil appeals. (*Post, pp.* 611-613.)

11. **APPEAL AND ERROR.** Question on which no error has been assigned not considered.

Questions on which no error has been assigned will not be considered in supreme court. (*Post, pp.* 613, 614.)

### FROM GILES.

Appeal from the Chancery Court of Giles County.—HON. W. B. TURNER, Chancellor, sitting by interchange with J. W. STOUT, Chancellor.

W. B. SMITHSON, for appellants.

WOODARD & WADE, JONES & WAGSTAFF, P. D. MADDIN, JNO. T. ALLEN, STEWART WILKES, ESLICK & ESLICK, for appellees.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

This is a contest between the collateral heirs of Miss Eleanor Spofford as to who inherits the lands of which she died seized and possessed. These lands, the record shows, are worth nearly $200,000, are located in Giles and Davidson counties, Tenn., and came to Miss Spofford from various sources.

Miss Spofford was born in 1861, and died on April 14, 1919. She was never married, and from 1885 until her death was a *non compos mentis.* Her mother was a Martin, and Miss Spofford's nearest relatives are cousins on the side of both her father and mother.

The Martin relationship is as follows:

Thomas Martin, late a citizen of Giles county, Tenn., died testate at Pulaski, his home, on the 13th day of January, 1870.

He had four children, viz.:

(1)   Victoria, a daughter, who died intestate, unmarried, and without issue, before the attainment of her majority.

(2)   Ophelia, who became the wife of Judge Henry M. Spofford.   Judge Spofford died testate August 20, 1880, and Mrs. Spofford died testate October 20, 1894.   They were survived by their three children, as follows:

(a)   Nina Spofford, who died intestate, unmarried, and without issue, December 18, 1898.

(b)   Thomas M. Spofford, who died testate February 24, 1915, but without issue.

(c)   Eleanor Spofford, born October 28, 1861, who died unmarried, intestate, and without issue on the 14th day of April, 1919.

(3)   A son, William Martin, who died survived only by one daughter, Laura, who became the wife of S. E. F. Rose; the said Laura being likewise dead, survived only by her said husband, who is in no way interested in the issue of this suit, and their two only children, S. C. Rose and Martin Rose, two of the defendants and cross-complainants below.

(4)   A daughter, Laura, who became the wife of Gen. Thomas G. Blewett, both of whom died survived by a son, their only child, Claude Blewett, who likewise is dead, survived only by his four children: Laura Blewett, Allena Blewett, Wilda Blewett, and S. J. Blewett, the other four of the defendants and cross-complainants below.

From the foregoing statement it appears that the direct Spofford line upon the death of Eleanor Spofford without issue became extinct; that the said two Rose children and the said four Blewett children are the only living descendants of Thomas Martin, being his great-grandchildren, and are the only living descendants, of course, of the sister and brother of the mother of the intestate, Ophelia M. Spofford —these said claimants being related to the intestate in the fifth degree, and being her maternal second cousins.

Spofford relationship:

Judge Henry M. Spofford, the father of the intestate, in addition to his own children, all of whom have since died without issue, as aforesaid, was survived by:

(1)   A brother, Ainsworth R. Spofford, who has since died, survived by children and grandchildren as follows:

(a)   Complainant Florence P. Spofford.

(b)   Complainant Charles A. Spofford.

(c)   The children (two) of a deceased son, Henry M. Spofford, viz.:

(aa)   Complainant R. W. Spofford.

(bb)   Complainant Edith Spofford Chandlee.

(2)   A sister, Susan Spofford Wiltsie, who has since died, survived by her five and only children, viz.:

(a)   Arthur Vernon Wiltsie.

(b)   Harriet W. Belknap.

(c)   Charlotte E. W. Tyler.

(d)   Laura S. Lake.

(e)   Mary E. Joslin.

Since the institution of the suit Mary E. Joslin has died, leaving a will, but her executrix is properly before the court.

From the foregoing statement it appears that the Spofford relationship are related to the intestate in the fourth degree, being her paternal first cousins, except R. W. Spofford and Edith Spofford Chandlee, who are her paternal second cousins.

The Martin and Spofford relations, set forth above, insist that they are entitled to all of the lands of which Miss Eleanor Spofford died seized and possessed.

Thomas Martin, the maternal grandfather of the intestate, Eleanor Spofford, being the father of her mother, Ophelia M. Spofford, had six brothers and sisters, who left children and grandchildren, who intervened in this suit, taking the position that they were heirs of Eleanor Spofford, and entitled to share in the real estate. These parties are very numerous, and their relationship is not disputed in this suit.

The chancellor and the court of civil appeals both held that these collateral kindred of Thomas Martin took no interest in said lands, and in this holding we concur.

Our statute of descent (section 4163 of Shannon's Code) is as follows:

"4163. *Land, How Inherited by Descendants, Collaterals, and Ascendants.*—The land of an intestate owner shall be inherited in the following manner by his lineal descendants, collateral kindred, or ascendants:

"(1) *Regardless of Source of Title.*—Without reference to the source of the intestate's title—

"(a) *By Descendants.*—By all the sons and daughters of the deceased, to be divided amongst them equally. And if any child of said intestate shall have died in his lifetime, his lineal descendants shall represent their parent, and be entitled to the same portion of the estate of the de-

ceased as their parent would have been entitled to if living. (1784, April Sess., chapter 22, sections 2 and 3; 1796, March Sess., chapter 14, section 1.)

"(b) *By Parents.*—If there be no issue, nor brothers or sisters nor their issue, and either parent be living, then by such parent. (1841-42, chapter 171, section 1.)

"(2) *Where Estate Was Acquired by Intestate Dying Without Issue.*—If the estate was acquired by the intestate, and he died without issue, his land shall be inherited—

"(a) *By Brothers and Sisters, or Their Issue.*—By his brothers and sisters of the whole and half blood, born before his death or afterwards, to be divided amongst them equally. And if any such brother or sister died in the intestate's lifetime, leaving issue, such issue shall represent their deceased parent, and be entitled to the same part of the estate of the uncle or aunt as their father or mother would have been entitled to if living. (1784, April Sess., chapter 22, section 3; 1784, Oct. Sess. chapter 10, section 2; 1841-42, chapter 171, section 2; 1796; chapter 14, section 1.

"(b) *By Parents, When.*—In default of brothers and sisters and their issue, the land shall be inherited by the father and mother of the intestate as tenants in common. (1784, April Sess., chapter 22, section 1784, Oct. Sess., chapter 10, section 3; 1841-42, chapter 171, section 1.)

"(c) *By Heirs of Parents, When.*—If both be dead, in equal moieties by the heirs of the father and mother in equal degree, or representing those in equal degree of relationship to the intestate; but if such heirs or those they represent do not stand in equal degree of relationship to the intestate, then the heirs nearest in blood or represent-

ing those who are nearest in blood to the intestate, shall take in preference to others more remote. (Id.)

"(3) *Where Estate Came from Parent, or Ancestor of Parent.*—Where the land came to the intestate by gift, devise or descent from a parent, or the ancestor of a parent, and he die without issue—

"(a) *By Brothers and Sisters of the Half Blood on Part of Parent from Whom Estate Came, When.*—If he have brothers or sisters of the paternal line of the half blood, and brothers or sisters of the maternal line also of the half blood, then the land shall be inherited by such brothers and sisters on part of the parent from whom the estate came, in the same manner as by brothers and sisters of the whole blood, until the line of such parent is exhausted of the half blood, to the exclusion of the other line. (1784, April Sess., chapter 22, section 3; 1784, Oct. Sess., chapter 10, section 2.)

"(b) *By Parent from Whom or Whose Ancestors Estate Came, When.*—If he have no brothers or sisters, then it shall be inherited by the parent, if living, from whom or whose ancestors it came, in preference to the other parent. (1784, April Sess., chapter 22, section 7; 1841-42, chapter 171, section 1.)

"(c) *By Heirs of Which Parent, When.*—If both parents be dead, then by the heirs of the parent from whom or whose ancestor it came. (1784, chapter 22, sections 3 and 7; 1784, Oct. Sess. chapter 10, section 3; 1796, chapter 14, section 1; 1841-42, chapter 171, section 1.)"

In *Wills of John D. and Joseph Miller,* 2 Lea, 59, this court, in speaking of the above statute, said:

"Moreover, the Code plainly tells us that the intention was to cover the whole law of descents. The section which

gives rise to the litigation, commences thus: 'The lands of an intestate owner shall be inherited in the following manner by his lineal descendants, collateral kindred, or ascendants.' It is claimed that the revisers and the legislature supposed that the whole of the existing law was brought forward, and that they intended to leave no case unprovided for. Of course, they may have been mistaken, but it would be very curious if the omission had escaped the scrutiny of the profession for twenty years."

The opinion then takes up an analysis of said statute for the purpose of showing that every case for the descent of real esate is provided for therein.

There are two classes of land which Miss Eleanor Spofford owned at her death in which these parties claim an interest. First, lands inherited from her sister Nina. This was "acquired" land, and falls under division "c" of subsection 2, and both the chancellor and the court of civil appeals very properly held that as to this property one-half passed to the Spofford relationship and the other half to the Martin relationship.

In *Wills of John D. and Joseph Miller*, supra, this court said: "The word 'acquired' was used in the broad sense, so as to cover lands which might come to the intestate in any other way than 'by gift' devise or descent from a parent or the ancestor of a parent.' "

The lands in the other class came to Miss Spofford by gift from her grandfather Thomas Martin, and fall within division "c" of subsection 3 of the statute, and upon the death of Miss Spofford vested in the heirs of her mother, to-wit, the two Rose children and the four Blewett children.

It is particularly with respect to this latter class of lands that the collateral kindred of Thomas Martin assert claim.

It is insisted, in the first place, that— "What is meant by the heirs of the mother are the heirs of the intestate on the part of the mother according to the reading of the Act of 1784, chapter 22, section 7."

The statute, in its present form, is exactly as it appears in the Code of 1858. It has been held by this court that the act of 1784, when construed in connection with chapter 171, section 1, of the Acts of 1841, was correctly carried into the Code. *Towls* v. *Rains,* 2 Heisk., 356.

And it has been decided that when a person inherits lands from his father, and dies without issue, brothers or sisters or their issue, or mother, surviving, they will descend to the heirs of his father. *Beaumont* v. *Irwin,* 2 Sneed, 291; *Miller, Wills,* supra.

According to the contention made here, they would descend to the heirs of the intestate on the part of his father.

In the second place, it is insisted that these collateral kindred of Thomas Martin are as closely related to Mrs. Spofford as are the Spofford and Martin relations, and hence that they should be permitted to share with them.

The statute states that the "heirs" of Mrs. Spofford shall take—not "the next of kin." There is quite a difference. The word "heirs" designates the persons appointed by law to succeed to the real estate in case of intestacy. *Alexander* v. *Wallace,* 8 Lea, 569; *Swanson* v. *Swanson,* 2 Swan, 446.

But when used with relation to personalty it means "next of kin." *Gosling* v. *Caldwell,* 1 Lea, 455, 27 Am. Rep.,

145 Tenn.—38

774; *Alexander* v. *Wallace,* supra; *Paine* v. *Gupton,* 11 Humph.,'402; *Ware* v. *Sharp,* 1 Swan, 490.

There can be no question but that if Mrs. Spofford's brother and sister were living they would constitute her heirs, and since they are dead their grandchildren represent them and take the shares which they would have taken if living, *per stirpes.* This is brought about by section 4164 of Shannon's Code, which is as follows:

"*Same Rules of Descent Beyond Grandchildren and Nephews and Nieces.*—The same rules of descent shall be observed in lineal descendants and collaterals respectively, when the lineal descendants are farther removed from their ancestor than grandchildren, and when the collaterals shall be farther removed than children of brothers and sisters. (1784, April Sess., chapter 22, section 4.)"

This statute in no wise conflicts with or alters the statute of descent. Before the passage of this statute collaterals further removed than children of brothers and sisters did not take by way of representation of their deceased parents, and it was to meet this situation that the statute was enacted. Since its passage there is no limit to representation among collateral heirs. *Miller, Wills,* supra; *Alexander* v. *Wallace,* supra; *Forrest* v. *Porch,* 100 Tenn., 391, 45 S. W., 676; *Barnes* v. *Redmond,* 127 Tenn., 45, 152 S. W., 1035.

When it comes to personal property there is a limitation on collaterals. Section 4173 of Shannon's Code provides that— "There is no representation among collaterals, after brothers' and sisters' children."

Hence, within the meaning of our statute of descent, these collateral kindred of Thomas Martin are not heirs

of Mrs. Spofford, and take no interest in any of the lands owned by Miss Eleanor Spofford at her death.

We will next dispose of the assignments of error made by the Spofford relations; the first being as follows:

"The court of civil appeals erred in sustaining the chancellor and decreeing that the Summer street property, on the death of Eleanor Spofford, descended as ancestral property from both Thomas Martin and Henry M. Spofford and vested one-half in the Roses and Blewitts and an undivided one-half in the Spofford kin, instead of reversing the chancellor and decreeing that said Summer street property, upon the death of Eleanor Spofford, passed as ancestral property coming from Henry M. Spofford and vested absolutely in the Spofford kin, to the exclusion of the Martin kin."

This property was conveyed in fee to Henry M. Spofford by the Nashville & Decatur Railroad Company on April 22, 1869. The recited consideration was $35,000, but the deed does not state who paid said consideration; but Mr. Martin executed his will on December 20, 1869, in which he stated that he paid said consideration, and the latter part of the sixth item of his will is as follows:

"And whereas I have purchased from the Nashville & Decatur Railroad Company twelve town lots, lying and being in the city of Nashville, five of them fronting on Broad street, and seven of them on Summer street, and had the titles conveyed to my son-in-law Henry M. Spofford who holds the same in trust for me—now it is my will and desire and I so devise one-half of said lots to my daughter Ophelia Spofford to be held by her upon the same terms and limitations as the property before devised to

her and the other half of said lots I devise to my son-in-law Henry M. Spofford."

It should be stated that under the terms referred to therein the one-half interest to Mrs. Spofford was for life with remainder to her three children, Eleanor, Thomas, and Nina.

Mr. Martin died in January, 1870, and his estate was administered by Judge Spofford; he being named sole executor and excused from executing bond as such. It is not claimed that Judge Spofford entered a dissent as to any provision of said will. On the other hand, he acquiesced in said provision and ratified and approved same by the following recitation found in his own will, to-wit:

"VII. I give devise and bequeath all my real Estate Situated in Nashville, Tennessee, with the exception herein stated, to my wife, Ophelia M. Spofford, during her natural life, with remainder over to her children, Share and share alike. I have improved with the joint funds belonging to my said wife and myself the five Broad Str. lots & the Summer Str lots bought of the Nashville & Decatur R. R. Co. and named in the will of Thomas Martin, having covered the Broad Str lots with a tobacco warehouse, and built a double tenement house on a portion of the Summer Str lots."

From this state of facts no other conclusion can be drawn but that this property belonged to Mr. Martin and that Judge Spofford held the mere legal title as trustee. There seems to be no question but that Mr. Martin paid the consideration, and that alone would raise a presumption of a trust in his favor which these parties have not attempted to disprove. *Dudley* v. *Bosworth,* 10 Humph., 12, 51 Am. Dec., 690.

They insist that, even though this be true, the legal title was in Judge Spofford until his death in 1880, at which time the fee and the beneficial interest merged, and they cite a number of authorities from other jurisdictions to the effect that the descent of ancestral property is controlled and determined by the source of the legal title, and that since the legal title came from Judge Spofford, their ancestor, they take to the exclusion of the Martin relations.

This question is controlled by statute in this State, under the provision of which all interest passes, whether legal or equitable. *McKinney* v. *Stacks,* 6 Heisk., 290; *Alexander* v. *Miller's Heirs,* 7 Heisk., 65.

This principle finds recognition in *Dudley v. Bosworth,* supra, in which the court said:

"The death of the nominal purchaser, and the descent of the mere naked legal title, cannot effect the trust."

The chancellor and the court of civil appeals both held that the title to this property was vested one-half in the Martin relationship and one-half in the Spofford relationship, and their decree in this particular will be affirmed.

The second assignment of error is as follows: "The court of civil appeals erred in sustaining the chancellor and in adjudging and decreeing that said sum of $13,482.91 expended by S. C. Appleby, trustee, in the erection of buildings on the Summer street property was converted out and out, instead of reversing the chancellor and adjudging and decreeing that said sum of $13,842.91 should not be distributed as personalty to the next of kin of Eleanor Spofford under the laws of the State of Tennessee."

The facts relative to this assignment of error are stated in the brief of the Spofford relations as follows:

"S. C. Appleby in 1908 succeeded Z. W. Ewing as trustee of the property of Eleanor Spofford in Tennessee. He expended of the money in his hands out of the personal estate of Eleanor Spofford the sum of $13,842.91 in erecting buildings upon the Summer street property. And these expenditures were attempted to be ratified and approved by the court at the instance of the said Appleby. Eleanor Spofford was a person of unsound mind but was not adjudicated such until 1903 in Kansas City, Mo. Eleanor Spofford was never adjudicated a person of unsound mind in Tennessee."

Under this state of facts we cannot say that the trustee acted without authority. Upon the other hand, we will assume that he acted in conformity with the power and authority vested in him as trustee. We presume that this trustee is the successor of Thomas Spofford under the will of Mrs. Spofford. Her will is copied into the transcript, and under its terms her son Thomas was made trustee for his sister Eleanor, and he was given authority to convert her property, change form of investment, and manage her affairs in such manner as he saw proper. The court was empowered by said will to appoint his successor, which, however, it had the power to do in the absence of such authority. While it might be urged that such authority was personal to Thomas Spofford, that question is not raised, and, in any event, it is not material, since the chancery court authorized or approved his action in the matter, and the court certainly had jurisdiction in the matter, and it cannot be said that its decree was void. The chancellor and the court of civil appeals disallowed this

claim of the Spofford relations, and their decree in this matter will be affirmed.

The third assignment of error is as follows:

"The court of civil appeals erred in sustaining the chancellor and in adjudging and decreeing that the one-half interest in the Nina Spofford property, to-wit, five hundred ninety-one and one-fourth acres in Giles county, Tenn., Cherry street property, and lots Nos. 4 and 5, Payne street, Nashville, Tenn., purchased from T. M. Spofford under the orders of the court in rule No. 5289, while Eleanor Spofford was a person of unsound mind, was a conversion out and out and should now be distributed as realty, instead of reversing the chancellor and adjudging and decreeing that said property so purchased was not converted in contemplation of law and that the same should now be distributed as personalty to the next of kin of Eleanor Spofford under the laws of the State of Tennessee."

Nina Spofford died intestate in Giles county, Tenn., on December 18, 1898, leaving surviving her as her only heirs at law, next of kin, and distributees Thomas M. Spofford and Eleanor Spofford, seized and possessed of the following property:

Lot No. 3, Martinhurst, containing five hundred ninety-one and one-fourth acres, situated in Sixteenth civil district of Giles county, Tenn.

Cherry street house and lot, Nashville, Tenn.

Lots Nos. 4 and 5, Payne street, Nashville, Tenn.

She also left personal property to the approximate amount of $100,000. John T. Allen qualified as her administrator and, joined by Thomas M. Spofford, filed his bill in the chancery court of Giles county, Tenn., rule

No. 5289, for the purpose of administering her estate. Eleanor Spofford was never adjudicated a person of unsound mind and her *status* determined as a *non compos mentis* in Tennessee. She never had a guardian in the State of Tennessee. Neither Thomas M. Spofford nor John T. Allen was her guardian. In this said cause a decree was entered, stating that it was to the interest and advantage of the said Eleanor Spofford, a person of unsound mind, to invest so much of her personal estate as was necessary to acquire the undivided one-half interest of T. M. Spofford in the real estate of which Nina Spofford died seized and possessed, and a decree was entered attempting to make said investment and to purchase the same at the price of $23,127.50, vesting title to the entire real estate above in Eleanor Spofford.

Eleanor Spofford acquired this Nina Spofford property one-half by inheritance from her sister, Nina Spofford, and one-half by purchase from her brother, Thomas M. Spofford, as above detailed.

Under the above assignment of error several questions are raised in the brief which are not based on any pleading. In their cross-bill the Spofford relations say:

"Further answering, as hereinbefore shown, respondents say that of the property set apart to Nina Spofford, that is, five hundred ninety-one and one-fourth acres Martinhurst lands, house and lot on Cherry street in Nashville, and Nos. 4 and 5, Payne street, Nashville, Tenn., Eleanor Spofford acquired one-half by inheritance and the other half by purchase under the decree of the chancery court of Giles county, Tenn., in rule No. 5289; a portion of her share of the personal property of the estate of Nina Spofford being used to pay T. H. Spofford for his

one-half of the realty inherited by him from said Nina Spofford. It will thus be seen by the court that one-half of the above real estate will pass as personal property and the other half inherited from Nina Spofford will pass as real estate, and that your respondent, together with the three complainants who are first cousins, will take all of one-half of said real estate as personalty; they being the next of kin of the said Eleanor Spofford, she having died intestate domiciled in Giles county, Tenn.

"Respondents further answer that it is immaterial what the original purchase price of the half interest in the real estate of Nina Spofford was at the time of the purchase under the decree of the court; that there never was a conversion out and out; and that said property passes in its present form as personalty; it being submitted to the court that the 'chancery court has inherent jurisdiction to convert estates of persons under disability, when to their manifest interest, and may convert their realty into personalty and their personalty into realty; still the converted property will pass under the statutes of descent and distribution in its former character, and not in its new or converted character.' It is shown to the court that the purchase under the decree of the court in said cause of *T. M. Spofford et al* v. *Eleanor Spofford* rule No 5289, was an investment of her personalty into realty and under the inherent jurisdiction of the chancery court, and hence it did not convert said personalty into realty out and out, but said realty so acquired must now be distributed in its present form under the statutes of descent and distribution as personalty."

So that the single question which we are called upon to decide under this assignment of error is where a court

lawfully invests the funds of a *non compos* in real property and the *non compos* dies intestate, never having regained her reason, does the real property so acquired, with her funds, pass as real or as personal property?

This question has not heretofore been determined by this court in any reported case.

The rule seems to be that a sale of real estate of an infant or a married woman in a partition suit, after confirmation, is a conversion out and out, and the proceeds will be treated as personal property. *Paul* v. *York*, 1 Tenn. Ch., 560; *Rogers* v. *Clark*, 5 Sneed, 665; *Jones* v. *Walkup*, 5 Sneed, 135; *Smalling* v. *King*, 5 Lea, 590; *Cowden* v. *Pitts*, 2 Baxt., 60; *Ex parte Moore and Wife*, 3 Head, 171; *Wayne* v. *Fouts*, 108 Tenn., 153, 65 S. W., 471.

But the right of election is preserved to the infant until the attainment of his majority, and if he dies pending his majority the converted property will be transmitted in its former character. *Paul* v. *York*, supra; *Singleton* v. *Love*, 1 Head, 357.

In *Paul* v. *York*, supra, it is said: "The reason of the rule is thus given by Lord ELDON *in Ex parte Phillips*, 19 Ves., 123: 'In the case of an infant it is settled, that, as a trustee out of court, cannot change the nature of the property, so the court, which is only a trustee, must act as the trustee out of court; and finding that a change will be for the benefit of an infant, must so deal with it as not to affect the powers of the infant over his property even during his infancy, when he has powers over one species of property, not over the other.'

"Another reason is the one implied in the rule as laid down above, that it is manifestly inequitable to so exercise a trust for the benefit of an infant, as, where it can

be avoided, to affect improperly the rights of parties who would otherwise be entitled to the fund. 'It is,' consequently, says Mr. Justice Story, 'the constant rule of courts of equity to hold lands purchased by the guardian with the infant's personal estate, or with the rents and profits of his real estate, to be personalty, and distributable as such; and, on the other hand, to treat real property (as, for example, timber cut down on a fee simple estate of the infant) turned into money, as still, for the same purpose, real estate. . . . And when the court directs any change of property, it directs the new investment to be in trust for the benefit of those who would be entitled to it, if it had remained in its original state.' 2 Sto. Eq. Jur., section 1357."

And on page 557 (referring to some New Jersey desions), the chancellor said:

"In that State, the question arose in *Snowhill* v. *Snowhill*, 3 Green's Ch., 20, where the land of an infant had been sold under a special act of the legislature, which had been enacted on representations that such sale would be for the benefit of the infant, and the infant died after the sale, under age. Chancellor Vroom, in a well-considered opinion, held that where property was lawfully changed in character by the legislature, that the heir or next of kin must take it as it actually exists, and that the proceeds of the sale passed as personal property. On appeal his ruling was reversed by the Court of Errors in a decision not reported. The question was again reviewed in *Oberle* v. *Lerch,* both by Chancellor Zabriskie, 3 C. E. Green's Ch. 346, and by the Court of Errors, 3 Id. 575, and the previous decision of the Court of Errors adhered to upon principle, and because in consonance with the

weight of authority. Upon principle, because, to use the language of the Chief Justice in the Court of Errors, 'it is a fixed principle of courts of equity never to permit the property of an infant to be charged from personal to real, or from real to personal, so as to affect the succession to it.' Citing 2 Atk., 413, and 1 P. Wm., 389. And because 'such course is also eligible in respect to the circumstance that it removes all temptations from the relatives of infants to endeavor, after a conversion of lands into money, to divert them from the line of descent.' The opinion of the Chancellor puts the latter objection more pointedly: 'While it is the doctrine of this court,' he says, 'that the property of an infant or lunatic must be managed for the benefit of the owner only, and not for that of heirs or next of kin, it is wise to hold that neither shall gain or lose by the change of its character; so that neither class will be tempted to procure a sale when it is not for the owner's benefit, or to defeat it when it would benefit him, as may, in the end, be for their own advantage. Some such persons generally have the management of the infant's estate; and, although the sale is ordered by the court, they have it in their power in these *ex parte* applications, so to place the matter before the court as to procure the decision they desire.' "

The reason for the rule is thus stated in the *Matter of McMillan*, 126 App. Div., 155, 110 N. Y. Supp., 622, to-wit:

"If infancy and incompetency coexist during minority, and the mental incapability remains after infancy has passed, the reason for the retention of the character of the property at the time of the sale is made is still present. The rule is primarily for the benefit of the incompetent

or infant, and yet, as there has long been a difference in the laws of descent and distribution, it is founded to some extent on the propriety of keeping unchanged the right of succession to the property in the event of the death of the [lunatic], infant or incompetent."

And further, in said case, on page 624, the court said: "It is a general rule and regulated by statute in this State, that, upon a sale of real estate of an infant or incompetent person, 'the proceeds are deemed property of the same nature as the estate or interest sold, until the infant arrives at full age, or the incompetency is removed.' "

Again, the court said: "The philosophy of the rule adverted to is that the land of the infant or incompetent has been sold without his volition or intelligent assent, and the character of his property must remain unchanged until the disability has been removed."

It will be noted from the above statements that the rule applies in cases of mental incapacity as well as in cases of infancy, and upon principle this appears to be necessarily true, for a *non compos*, while such, can no more elect than can an infant. This rule seems to be in line with the great weight of authority.

In 13 Corpus Juris, section 671, it is said: "Where the real estate of a lunatic is sold by his committee under a statute or by order of the court, the better doctrine is that the proceeds of such sale remain realty for the purpose of distribution on the death of the lunatic; and where such proceeds are regarded as realty, the increase or gain derived from the sale of securities in which they are invested is also to be treated as realty, but the income from such investment is also to be treated as realty, but the income from such investment derived during the life of a

lunatic is to be treated as personalty. Where the committee of a lunatic invests part of his personal estate in lands in fee, such lands should be regarded as personalty."

In 14 Ruling Case Law, section 37, p. 581, it is said:

"It is the general rule that where the real estate of a lunatic is sold by his committee or guardian under statute, or by order of the court, the proceeds of the sale remain realty for the purpose of distribution on the death of the insane person. Having been sold without the owner's assent, the character of his property must remain unchanged until the disability has been removed."

Mr. Pomeroy in his work on Equity Jurisprudence (3 Ed.), vol. 3, p. 2320, under the head of "Conversion by Paramount Authority," thus states the principle:

"But if the owner is an infant or a lunatic, or the land is in settlement, the purchase money remains land; there is no conversion. Where land is sold by order of the court for any purpose, it is a fixed principle, upon which the court always proceeds, that the character of the property should be changed only so far as may be necessary to accomplish the particular purpose."

And in the note it is stated: "The court will not, without sufficient cause, change the nature of a lunatic's property. If lunatics' lands are sold by order of court, the surplus of the money always remains real estate."

In the note to McClain v. McClain (Ky.), Ann. Cas., 1915A, 158, the annotator says: "The general rule is, in accord with the holding in the reported case, that where the real estate of a lunatic is sold by his committee under statute or by order of court the proceeds of sale remain realty for the purpose of distribution on the death of the lunatic," citing and reviewing many authorities.

The court, in *Pickens' Ex'rs* v. *Kniseley et al.*, 36 W. Va., 794, 15 S. E., 997, said: "A conversion of land into money by mere act of the law, as by sale under the decree of the court, works a conversion into personalty only so far as is necessary to accomplish the particular purposes of the sale."

And in *Oberly* v. *Lerch*, 18 N. J. Eq., 346, it was stated: "An infant or lunatic cannot elect, and therefore cannot change the character impressed upon the property."

We are therefore of the opinion that the one-half interest which the court purchased for Miss Spofford from her brother in the property in question passes as personalty to be distributed among her next of kin. The chancellor and the court of civil appeals took a contrary view, and their decree in this respect will be reversed.

Reverting to the question of the funds expended in improving the Summer street property, it will be recalled that that was done under the authority of Mrs. Spofford's will. She had a perfect right to direct the trustee to improve the real property or to convert same into personalty or to invest personalty in real property, and this is exactly what she did, and the question of assent or election was not involved, for had Miss Spofford become sane she would have had no voice in the matter, and hence the investment or expenditure of funds in improving the Summer street property was an out and out conversion.

We will now dispose of the errors assigned by Col. Smithson and others; the substance of the first four being that the other courts erred in substituting certain named attorneys for W. B. Smithson as counsel for certain of the Spofford relations.

Speaking as to these errors, the court of civil appeals, in its opinion, says:

"It is to be observed that the first four of these assignments direct themselves to the question of asserted error on the part of the court in permitting and allowing the clients and parties litigant named therein to withdraw their employment of Noble Smithson and W. B. Smithson, and to substitute therefor the other lawyers stated in the assignments, and to withdraw their names from certain pleadings prepared in their behalf by Noble Smithson and W. B. Smithson, and assume a different attitude in the law suit from that assumed for them by said Smithsons.

"It is insisted with much of vigor and earnestness that Smithson & Smithson had a contract with these parties by the terms of which they were employed as counsel to represent them and their interests in the pending litigation, and that the contract thus made and entered into between parties counsel and client was of such character as that the contract thus entered into was coupled with an interest in the subject-matter of the litigation; that is to say, that the Smithsons were to have, under the terms of the contract, a certain per cent. of the recovery of their clients in this litigation.

"We do not think there can be any question at this time but that these parties had a perfect right at any time under the law to discontinue the services of their counsel, and especially is this true where cause is shown therefor. Just two or three of these authorities may be adverted to. Ruling Case Law thus announces the rule:

" 'The authorities uniformly recognize the right of a client to terminate the relation between himself and his

attorney at his election, with or without cause; the exist-
ence or nonexistence of a valid cause for the discharge of
the attorney bearing only upon his right to compensation.
This power cannot be affected by a previous arrangement,
as, for instance, by a contract for a contingent fee. The
right of a client to change his attorney at will is based
on necessity in view of both the delicate and conditional
nature of the relation between them and of the evil en-
gendered by friction or of distrust. . . . An attorney
is, of course, entitled to notice of his discharge, though
such notice need not be formal; any act being sufficient
which shows an intention to sever the relation.' 2 R. C.
L. p. 957.

"Corpus Juris thus states the law:

" 'The law is well settled that a client has the right to
discharge his attorney at any time, either with or without
cause, and this is true, although the motion for permission
to substitute is restricted by persons claiming to be the
assignees of the interest of such parties where there is
a controversy as to such assignment. The relation between
attorney and client is such that the client is justified in
seeking to dissolve that relation whenever he ceases to
have absolute confidence in either the integrity, the judg-
ment, or the capacity of the attorney. Such applications
are ordinarily allowed as matter of course, unless it ap-
pears that such good reasons exist that justify the court
in refusing to make the order.' 6 Corpus Juris, 670-677.

"And again: 'The relation of attorney and client is pe-
culiar, in that the law permits the termination thereof in
a manner not recognized in other contracts. Either party
may dissolve the relation for cause and the client may dis-
solve it without cause.' 6 Corpus Juris, 673.

145 Tenn.—39

"And authorities might be multiplied along this line. Among others *Todd* v. *Superior Court,* 181 Cal., 406, 184 Pac., 684, 7 A. L. R. 938. But we refrain from further discussion of this proposition of law because it is so thoroughly well settled, we think, as that it admits of no question. Of course, the principle is recognized that where the relation is severed this does not determine the question of compensation, but that is the subject of contest between the parties in their own way.

"These parties toward whom these assignments of error are directed saw proper to dispense with the services of these gentlemen and secure the services of other counsel in the case, and the court, by express grant of authority, permitted the parties, by order in the case, to make such withdrawal of their employment, and to substitute other counsel who represented them from that period on during the further progress of the litigation, and while we refrain from going into the details in respect of the matter, they not being essential, in our judgment, as bearing upon the right of clients to dispense with services of counsel, we may say that the question was passed upon distinctly by the lower court with all the facts before him, and he held that these clients had the right to dispense with the services of counsel.

"The law being clear and explicit, as stated, we see no good results to accrue from any elaborate statement of fact, but content ourselves with holding that there is no reversible error under the record in permitting the withdrawal by these clients of their relationship with counsel and severance of their relations, and their change of attitude under the pleading issues in the case from complainants to defendants, or defendants to complainants, and the filing of other and different pleadings assertive of their

rights. So that the first four assignments of error are overruled."

The general rule of law being as set forth above, and the chancellor and the court of civil appeals having concurred in holding that these parties had the right, under the facts, to discharge their original counsel, we are bound by said concurrent finding. There is no assignment of error to the effect that there is no evidence to support their finding. This does not preclude counsel from recovering from their clients just and adequate compensation for services rendered.

The fifth assignment of error is as follows:

"The court of civil appeals erred in adjudging and decreeing that lot No. 1 on Payne street and lots Nos. 9, 10, and 11 on Lischey avenue were ancestral property, and came to Eleanor Spofford through inheritance from Thomas Martin, her grandfather on the maternal side, since the record nowhere discloses that said Thomas Martin ever owned this land, nor any part of same, nor that the legal title of said property was ever in said Thomas Martin; but, on the other hand, it appears from a decree entered December 23, 1896, in the cause of *Nina Spofford* v. *T. M. Spofford et al.,* that Thomas Martin never owned any interest in any of these lots, since that decree recites that these lots are 'Set apart to the said Eleanor Spofford in lieu and place of her interest in fee in the real estate of Thomas Martin, deceased, in the city of Nashville.' "

This assignment is fully answered by the following statement taken from the brief of counsel for the Martin relations, to-wit:

"In the seventh item of the will of Judge Spofford it is recited:

" 'I acquired by purchase and exchange of debts due the estate of Thomas Martin the lots on Payne street, bounded west by Walnut, opposite Chattanooga freight · depot, measuring, I believe, two hundred or three hundred feet. These last-named lots I give and bequeath absolutely to my said wife in full property to improve, sell or dispose of as she pleases.'

"The chancellor held, and the court of appeals affirmed the holding, that these Payne street lots did not pass under the will of Judge Spofford, since, by the very terms of that will, it is disclosed that these lots were the estate of Thomas Martin—having been acquired for the benefit of his estate after his death by his executor, who was Judge Spofford. In consequence, in the partition suit aforesaid dividing the real estate of Mr. Martin, Judge and Mrs. Spofford, lot No. 1 on Payne street was set apart to Eleanor Spofford as part of the realty of her grandfather, Mr. Martin, as set forth in the decree above quoted, setting this lot apart to her in said proceeding.

"As to the Lischey avenue lots: Under the will of Henry M. Spofford, in the sixth item thereof, certain real estate in Pulaski was devised by him absolutely to his wife, Ophelia M. Spofford. T. M. Spofford, as executor of the latter's will, exchanged certain of this property with J. D. Pullen for two hundred and thirty-three feet on Lischey avenue, which includes lots Nos. 9, 10, and 11, fifty feet each, and also another lot with which this litigation is not concerned. In the partition proceeding aforesaid, in equalizing the allotments among these children out of the three estates being partitioned, these lots were set apart to Eleanor Spofford as part of her grandfather's estate, as set forth in the decree above noted—this decree reciting

that these lots, together with the other lots in Nashville, are 'set apart to the said Eleanor Spofford in lieu and place of her interest in fee in the real estate of Thomas Martin, deceased, and Henry M. Spofford, deceased, in the city of Nashville, described in said report, so as to equalize her in the division of said real estate in which she took a remainder interest in fee under the will of Thomas Martin and Ophelia M. Spofford.'

"In other words, in order to equalize Eleanor Spofford with her brother and sister in a division of the real estate of their grandfather, these Lischey avenue lots were set apart to her, and, of course, for the purposes of division as a part of the estate of her grandfather, and must descend in that character."

As to the domicile of Miss Eleanor Spofford, the chancellor and the court of civil appeals both held that she was domiciled in Tennessee.

It is insisted on behalf of counsel for the Martin relations in their brief that this question had been previously otherwise adjudicated in both the courts of Tennessee and Missouri, and it is stated that no assignment of error is made, for the reason that the adjudication of this question by the chancellor and the court of civil appeals was premature.

Since, in this court, no error has been assigned upon this question, we refrain from making any comment thereon.

It results that the decree of the chancellor and the court of civil appeals will be affirmed, except as to the one-half interest in certain lands purchased for Miss Eleanor Spofford, from her brother, Thomas Spofford, and as to this matter the decree of the other courts will be reversed.

Spofford v. Rose.

The collateral kindred of Thomas Martin will pay one-fifth, the Spofford relations two-fifths, and the Martin relations two-fifths of the costs in the various courts through which this suit has passed.

A decree may be drawn by counsel in conformity with this opinion, in which the cause may be remanded, if necessary.