BIRDIE J. DUDROW AND MABLE S. KING, AN
INFANT, BY HER GUARDIAN AND NEXT FRIEND,
RUTH D. KING, *vs.* JAMES R. KING ET ALS.

*Real estate*: *laws of inheritance; by descent ˉor purchase; whole*
  *and half blood; lands conveyed away and reconveyed.*
              *English Courts; decisions of—.*

A, one of eight children, brothers and sisters of the whole and
  of the half blood, joined with the others in conveying to B.
  lands descended to them as the sole heirs of their father;
  B immediately reconveyed the same to A; the intention was
  to vest in him the title of his brothers and sisters, he having
  been wrongly told that he could not acquire title directly
  from his co-heirs. *Held,* that this conveyance and recon-
  veyance did not break the descent of the one-eighth interest
  in the land that A. had inherited from his father.    p. 186

Upon A's dying intestate, leaving no father or mother, brothers
  or sisters, but only some nieces, children of his brothers or
  sisters of the whole blood, and nephews and nieces, children
  of the half-brothers and half-sisters, it was held that the
  property conveyed to him by his brothers and sisters should
  be divided among his nieces of the whole blood, but that the
  one-eighth' interest he acquired by descent from his father
  should be divided among the nieces of the half blood and
  whole blood.        ·              pp. 186, 191

But in general, if one who holds by descent conveys away his
  interest and it be conveyed back to him, he holds thereafter
  by purchase and not by descent.               p. 187

A decision of the High Court of Chancery of England, ren-
  dered in 1798, is not a binding authority in Maryland. p. 188

*Decided January 9th, 1912.*

Appeal from the Circuit Court for Frederick County in
Equity (MOTTER, J.).

The cause was argued before Boyd, C. J., Briscoe, Pearce, Burke, Thomas, Pattison and Stockbridge, JJ.

*Glenn H. Worthington,* for the appellants.

*Urner & Urner,* for the appellees.

Pearce, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court of Frederick County, ratifying an auditor's account distribut-ing the sum of $1,054.10, part of the proceeds of sale of the real estate of Edmund Dorsey King of Frederick County, deceased, and the sole question presented is whether the dis-tribution shall be to the next of kin of the whole blood alone or to the next of kin of *both* the whole and half blood.

. Singleton King died intestate in 1897 seized of a farm in. Frederick county, Maryland, containing 155 acres, and leav-ing a widow, Caroline King and eight children, his only. heirs at law. Four of these children, Singleton L. King, James Harrison King, Mary Jane Browning and William King were by the first wife of the deceased, and four, viz, Mrs. Manzella Bell, J. Beall King, E. Dorsey King and Caroline C. Harris, were by the second wife. His widow, Caroline King, was his third wife and had no children. The real estate in question, therefore, descended upon the death of Singleton King, to the above named eight children, sub-ject to the dower of the widow, Caroline King.

Edmund Dorsey King became the administrator of his father, and entered into an agreement with his brothers and. sisters, and with Caroline King to purchase all their interest in said real estate for the sum of $6,986.25, but being advised, erroneously, that he could not purchase directly from them, because he was the administrator of their father, he united with them in conveying said real estate, by deed dated January 8th, 1898, to Wm. P. N. Lawson, with the understanding among all said parties that said Lawson should immediately convey the same to said Edmund Dorsey King

by a deed *then prepared,* and intended to be of even date with the deed to said Lawson. This deed to Lawson was not acknowledged by all the grantors until January 27th, 1898, as they resided in different places, but when it was acknowledged by all, Lawson, by deed dated February 2nd, 1898, conveyed the property to Edmund Dorsey King, it being described in the deed to Lawson as the same which descended from Singleton King to his eight above named children, subject to the dower of Caroline King; and being described in the deed from Lawson as the same described in "a deed from Caroline King and others *of even date herewith,* and intended to be recorded herewith, to the said Wm. P. N. Lawson." The same consideration was expressed in both deeds, viz, $6,986.25, but Lawson did not pay the same nor any sum whatever to any of the grantors in the deed to him, nor did he receive, nor was he intended to receive any beneficial interest whatever in said real estate; but he accepted said conveyance to him, in trust to convey the property to said Edmund Dorsey King, in the manner and for the purpose for which he did convey it, and Edmund Dorsey King concurrently with the delivery of both said deeds paid the entire purchase money to his stepmother and his brothers and sisters.

Edmund Dorsey King died intestate in 1910 leaving surviving him no child or descendant, no father or mother, brother or sister, but leaving two nieces, Mabel S. King, a child of his deceased brother, J. Beall King, and Birdie J. Dudrow, a child of his deceased sister Manzella Bell, as the only descendants of his brothers and sisters of the whole blood; and leaving also a number of nieces and nephews, descendants of his brothers and sisters of the half blood all of whom are named in the proceedings.

The real estate in question was sold under a decree of Court by the trustee appointed for that purpose, for $15,530, and the sale being reported, the purchaser filed exceptions thereto, because of the claim of the nieces and nephews of the half blood to an interest in said real estate, they not having been

made parties to the proceedings. They were thereupon made parties by order of Court, upon petition of the purchaser, and all appeared and answered said petition, setting up their claim in their answers, and the two nieces of the whole blood demurred to said answers.

The sale was ratified and an auditor's account was stated distributing the net proceeds equally between the two nieces of the whole blood, upon the theory that Edmund Dorsey King took title to the whole tract by purchase. Exceptions were filed to this account by the nieces and nephews of the half blood, which exceptions were sustained, and the said auditor's account was rejected, and the auditor was directed to state another account distributing seven-eighths of the net proceeds to the two nieces of the whole blood, and one-eighth to the nieces and nephews of the whole and half blood. Upon this basis, the sum of $1,045.10, is distributed to the nieces and nephews of the half blood, and to that distribution the two nieces of the whole blood except, and their exceptions being overruled, and the auditor's account being ratified, they have appealed.

Sections 3 and 4 of Article 46 of the Code provide that where the estate descended to the intestate on the part of the father, if there be no child, or descendant, or father, living, it shall descend to the brothers and sisters of the intestate of the blood of the father and their descendants equally.

Section 19 of Article 46 provides that if the estate shall be vested in the intestate by purchase, or shall descend to or vest in him in any other manner than by descent on the part of the father or mother, and there be no child or descendant of the intestate, then the estate shall descend to the brothers and sisters of the intestate of the whole blood and their descendants in equal degree, equally.

Section 26 provides that there shall be no distinction between brothers and sisters of the whole and half blood, all being descendants of the same father, where the estate descended on the part of the father.

· ˙Upon the death of his father intestate, Edmund Dorsey King took one-eighth of· the land in question by descent from him, and the only question for us, is whether the effect of the two conveyances above mentioned, broke this descent and changed his title to that one-eighth, from a title by descent to one by purchase. The learned judges of the Circuit Court held that no change of title was effected and we are of opinion their decision was correct.

· It is quite clear from the admitted facts in the case that there was no actual intention on the part of Edmund Dorsey King, by adopting the course of conveyancing used, to effect any change in the title which he took from his father to that one-eighth of the estate, and that no change could have been effected, if he had taken a conveyance, as he contemplated, from his brothers and sisters of their seven-eighths of the estate. The question could not have arisen but for the erroneous advice given him that he could not acquire any title by direct purchase from them.

It may be observed here that the demurrer of the appellants to the answer of the appellees admits the averments of the eighth and ninth paragraphs of the answer, that "it was understood between Edmund Dorsey King and his brothers and sisters that he should not dispose of said farm," and "that on his death it would descend by inheritance to all of his said brothers and sisters, if living, and if not, then to their descendants *per stirpes;* * * * as they did not know there was any difference in law as to the right of inheritance between the children of the first wife and those of the second wife." * * * "And that they would not have agreed to sell him their interests in said farm at the valuation of $45 per acre, being $20 less per acre than the land was worth, if it had not been for their understanding that he was not to dis-· pose of said·farm, and that it would come back to them or their descendants on his death." This consideration could not, of course, defeat an intention to break the course of descent by an apt conveyance, nor could it control the opera-· tion of a conveyance, *the clear legal effect* of which was to

break the descent although not so intended, but it is an element of this case not to be disregarded in the light of all the cases upon the subject.

The general rule is that if one who is in by descent convey his interest away, and it be conveyed back to him he holds thereafter by purchase and not by descent. The rule is stated thus in *Coke upon Littleton*, Vol. 1, 12 b.: "If a man be seised of lands as heire of the part of his mother, and maketh a feoffment in fee, and taketh back an estate to him and his heires, this is a new purchase, and if he dyeth without issue, the heires of the part of the father shall first inherite." The authorities, ancient and modern agree that this is the general rule. But in a note by Mr. Hargrave to the above text of Coke, it is said: "But here LORD COKE must be understood to speak of two distinct conveyances in fee; the *first* passing the use as well as the possession to the feoffee, and so completely divesting the feoffor of all interest in the land; and the *second* regranting the estate to him. For if in the first feoffment, the use had been expressly limited to the feoffor and his heirs, or if there was no declaration of uses, and the feoffment was not on such a consideration as to raise an use in the feoffee, and consequently the use resulted to the feoffor, in either case he is in of his *ancient use,* and not by purchase." It is upon the doctrine of this note of Mr. Hargrave that the Court below was satisfied to rest its decision. That doctrine however, is supported by lawwriters of high authority and by cases illustrating its application.

In *Greenleafs Cruise on Real Property*, Vol. 2, Title Descent, p. 338, and p. 341, states the law in almost the exact words of Mr. Hargrave's note to which he refers on page 338, and on page 341 cites *Godbold* v. *Freestone,* 3 Lev. 406, in support of the rule. He states that case as follows: "A person seised of lands by descent *ex parte materna* made a feoffment of them to uses; to the use of himself for life, remainder to his wife for life; remainder to the heirs of his body on his wife begotten, remainder to his own right heirs. * * * Adjudged that upon the death of the husband without

issue the remainder descended to the heirs of the feoffer *ex parte materna, because the ancient fee remained in him.*"
And he adds, on page 341, "Where a fine was levied or a common recovery suffered, if the use was not altered, the mode of descent was not changed." In a more modern work, *Broom and Hadleys Commentaries,* top page 660, the same doctrine is stated thus. "If one seized *ex parte materna,* made a feoffment in fee so as to part with the estate *absolutely* and then took a reconveyance the descent was broken, but if he made a conveyance for the purpose of creating particular estates and limited the ultimate fee to himself, this was held to be the same estate he had before, and it descended to the heir *ex parte materna.* The estate which is taken back must be in reality *a new estate,* and not merely a part of the old estate, unless it comes within the *Statute of 3rd & 4th William,* 4 Ch. 106, sec. 1, enacted in 1833," which changed the rule previously stated, but which is, of course, not in force in Maryland.

The great case of *Cave* v. *Holford,* 3 Vesey, 650, is the most interesting discussion of the principles here involved which we have examined. In that case, the opinions of Justices Rooke, Heath and Buller given in the Court of Common Pleas, controlled the decision, while Chief Justice Eyre dissented, and the opinions of each of these justices are reported in full, the editor of the reports referring to it as a case involving deep research of authority. The judgment of the Court of Common Pleas was affirmed by the high Court of chancery, but that decision having been rendered in 1798, is not binding upon us as authority, and we are free to consider it with that deference which is due to all the cases of the higher Courts of England.

In this spirit we have examined that case, and in our judgment the conclusion of Chief Justice Eyre rests upon principles more in accord with justice, and with an enlightened view of the application of legal principles, and more in consonance with the views of the Courts of this country upon this question. The form in which the question was there

presented, was whether the conveyance by a testator, of property devised by his will, was a revocation of the will as to that property, upon the ground that after acquired property could not pass by the will. The conveyances which were there held to operate as a revocation of the will were of lease and release, and CHIEF JUSTICE EYRE said: "Let the operation of this conveyance be what it may, the testator died seised of that estate which he had at the time he executed the will; * * * and that I may be clearly understood, when I say the same estate, I do not mean the identity of the land, but the quality of estate and interest in that land. I mean to argue that he died seised of the old use; to which the new estate, right, title, and possession (to use the words of the statute) that was for a moment in the trustees, under the conveyance, had united itself, not as a new estate, right, title and possession, but according to the quality, manner, form and condition of that old use, for those are the words of the statute. Here I take my ground * * *. The intent of the parties in this deed and the whole substantial effect (be its formal operation what it may) was simply to secure a jointure of £1400; and the estate, subject to that, was not intended to be altered or in any manner affected; and as far as the form of the conveyance purports to alter the nature and quality of the estate, it goes beyond the object of the conveyance. Courts of justice not only do not incline to allow the form of the conveyance to go beyond the intention, but will be ready to adopt all expedients to prevent it and to confine the operation of every conveyance to the special purpose," citing for this purpose LORD HARDWICKE in *Parsons* v. *Freeman,* 3 Atkyns Report, 741. Referring to *Tichner* v. *Tichner,* the CHIEF JUSTICE said: "They, the judges, wisely determined the purpose of conveyance was everything, the form nothing; * * * and upon that authority, supported by that of LORD HARDWICKE in *Parsons* v. *Freeman,* I am of opinion that the authorities will be better supported by declaring that this conveyance is not a revocation, than by the contrary determination." It is significant, moreover, that in the opinion

of Mr. JUSTICE ROOKE he observes "you must distinguish between an intention to have the land as a new purchase, and an intention to revoke the will," thus intimating a distinction between the case of a mere conveyance and reconveyance to accomplish some collateral purpose, and a case involving *also* the question of the revocation of a will as to the special property under consideration, as a result of a conveyance and reconveyance after the execution of the will. And in the opinion of Mr. JUSTICE BULLER in the same case, he refers to *Godboldt* v. *Freeman,* 3 Levinz, 406, and *Abbott* v. *Burton,* 2 Salk, 590, in both of which the estate taken back was held to be of the old use and therefore to go to the heir *ex parte materna* and he says *"in these last two cases* there was no question about a revocation." The principles thus announced are not without support by analogy in our own decisions. In *Lynn* v. *Gephart,* 27 Md. 563, where the question before the Court was as to changing the *quality* of property from real to personal by a deed of trust, our predecessors said. "The inclination of Courts of equity upon this branch of jurisprudence, is not generally to change the quality of property unless there is some clear intention or act by which a definite character either as money or land has been unequivocally fixed upon it throughout."

The views expressed by CHIEF JUSTICE EYRE above are in exact accord with the language of JUDGE ROBINSON in *Rawlings* v. *Lowndes,* 34 Md. 643, where he said: "At common law the widow was entitled to dower in the lands and tenements by which the husband was seised as of an estate of inheritance during the coverture. If however, the *seisin* was merely *instantaneous, intended as a means of accomplishing some ulterior purpose in regard to the estate,* the husband being as it were, a *conduit,* through which the estate passed, without any intention to clothe him with a *beneficial* interest, the widow would not be entitled to dower, as for instance a conveyance to a trustee to reconvey, or as put in the old books, a levy by way of a fine, the conusee rendering back by the same fine, the lands and tenements

to the conusor. The husband in such cases holds the *bare legal title* without any *beneficial interest.* 2 *Crabbs Real Prop.* 81; *Washburns Real Prop.* 176; *Coke Litt.* 31, b" and in *Glenn* v. *Clark,* 53 Md. 606, this is said to be "the established law in Maryland."

The cases of *Freeman* v. *Allen,* 17 Ohio State, 527, and *Carter* v. *Day,* 59 Ohio St. 96, both cases for partition of land of which the ancestor died seised, support the conclusion reached in this case by the Circuit Court, and the case of *Helfinger* v. *Wolf,* 11 Ohio Dec. (Reprint) 906, which is not a case for partition will be found especially instructive. That case is fully and clearly reasoned, and the conclusion reached by the Court is thus expressed. "Where one owning both the legal and equitable estates by descent, parts by her own act momentarily with the mere technical legal title, retaining the entire beneficial interest which standing alone would have descended as ancestral, thus creating a mere dry trust, which is held to her unqualified use, the immediate reacquirement of the naked title does not break the descent and constitute her a new source of title, for she conveyed the title for her own use."

This case has been argued for the appellants with great zeal and very ably, and their argument is sustained by the decision in *Holme* v. *Shinn,* 62 N. J. Eq. 1, in an elaborate opinion by the Chancellor, and also by the case of *Nesbitt* v. *Trindle,* 64 Ind. 185, but we are not able to adopt the views there held for the reasons already stated.

*Order affirmed, with costs to the appellees above and below.*