RONEY et al. v. DYER et al.—161 S. W. (2d), 640.

Western Section. November 10, 1939.

Petition for Certiorari denied by Supreme Court, February 17, 1940.

Hudgins & Hudgins, of Union City, for appellants.
E. A. Morris, of Obion, and F. J. Smith, of Union City, for appellees.

ANDERSON, J. This suit involves a determination of the nature and extent of the interest of the respective group of parties in two tracts of land in Obion County, of which W. F. Parker, deceased, died seized and possessed. Parker died intestate without issue, never having been married. The controversy is between the children and grandchildren of his two half sisters of the maternal line upon the one hand, and the children and grandchildren of his sister of the whole blood, Martha Parker Dyer, upon the other. The former are the complainants and the latter the defendants.

Both tracts of land were originally inherited by W. F. Parker and his sister, Martha Parker Dyer, from their father L. N. Parker, who

died intestate. The land was, therefore, ancestral in character so that, nothing else appearing, upon the death of W. F. Parker intestate without issue surviving, his interest would have descended to his whole sister who survived him, to the exclusion of the maternal line. Deadrick v. Armour, 10 Humph., 588; Lucas v. Malone, 106 Tenn., 380, 61 S. W., 82; Chaney v. Barker, 42 Tenn. (3 Baxt.), 424; Lane v. Crutchfield, 40 Tenn. (3 Head), 452; Kyle v. Moore, 3 Sneed, 183, 184.

Parker and his whole sister executed quitclaim deeds whereby each conveyed to the other a certain portion of the property inherited from their father. Also Parker conveyed a certain part of the land to a stranger and afterwards purchased it at a public sale held to enforce a vendor's lien in his favor.

The question for determination is whether the interests or any part thereof involved in these transactions or either of them can be said to have been "acquired" by W. F. Parker within the meaning of the statutory provision carried into subsection (2) (a) of Code, section 8380[1], so that the descendants of his half sisters were let in for a share with the whole sister, or whether at the time of Parker's death these interests still retained their "ancestral" character so that the half blood of the maternal line were excluded.

The facts we find to be as follows: The property in question originally consisted of two tracts, one known as the Kindall tract or "Home Place tract," containing 125 acres, and the other known as the Pamplet tract, containing, according to the conveyances, 175 acres, but, according to the proof, 216 acres, the latter appearing to be the correct number. Both tracts were originally owned by L. N. Parker, who died intestate about the year 1889, survived by his wife Polly Ann Parker and leaving as his children and heirs at law W. F. Parker and Martha Parker Dyer, the issue of his marriage to Polly Ann Parker. The latter had been previously married to one Pinion, by whom she had had two children. The complainants are the children of the issue of the Pinion union. W. F. Parker died on July 3, 1937, intestate without issue, having never married, leaving as his heirs his whole sister, Martha Parker Dyer, and the children of his half sisters, the complainants, whose mothers had predeceased Parker. Martha Parker Dyer died a few months after her brother, leaving surviving her children and grandchildren who are the defendants. No homestead

[1]So far as they are pertinent here, the applicable statutory provisions regulating the inheritance of land of an intestate owner were carried into the Code of 1932, Section 8380, without modification. Subsection 2(a) provides that "If the estate was acquired by the intestate, and he died without issue, his land shall be inherited—(a) By his brothers and sisters of the whole and half blood, born before his death or afterwards, to be divided amongst them equally. And if any such brother or sister died in the intestate's lifetime, leaving issue, such issue shall represent their deceased parent, and be entitled to the same part of the estate of the uncle or aunt as their father or mother would have been entitled to if living."

and dower was ever set aside to Polly Ann Parker, the widow of L. N. Parker. One June 4, 1889, Martha Parker Dyer and her husband executed an indenture wherein they released and quitclaimed unto W. F. Parker and his heirs all of their interest in the Kindall tract and also all of their interest in a portion of the Pamplet tract north of a certain division line containing 116 acres. On the same day W. F. Parker and his mother, Polly Ann Parker, executed a similar instrument wherein they release and quitclaimed unto Martha Parker Dyer and her husband, R. H. Dyer, all of their interest in the Pamplet tract south of said division line. This portion is shown to have contained about 100 acres. The instrument executed by Martha A. Dyer, who was the same person as Martha Parker Dyer, and husband recites, apparently on the margin, the following: "Division of real estate. R. H. Dyer and wife Martha A. Dyer is to have two mules and one coalt knowas the sorrel mares coalt the other is known by the name of Kate also two heifer yearlings and W. F. Parker and mother is to have all of remaining real estate belonging to L. N. Parker, deceased, and we the said W. F. and Polly Ann Parker is to pay all debts against the estate of L. N. Parker, deceased." The instrument executed by W. F. Parker and mother, Polly Ann Parker, recites that: "Divisions of the real estate. We the said W. F. and Polly Ann Parker do give to R. H. Dyer and Martha A. Dyer two mules one mule known as the sorrel mare colt the ——— by the name of Kate and also two heifer yearlings, and we W. F. Polly Ann Parker is to have all the remaining property belonging to the estate of L. N. Parker, deceased, and we the said W. F. and Polly Ann Parker are to pay all of said debts against the estate of L. N. Parker deceased." There followed the signature of Polly Ann Parker and W. F. Parker, with the date, June 4, 1889.

The Parker "Home Place" was on the Kindall tract and it will be noted that as a result of the execution of these instruments W. F. Parker was allotted all of the Kindall tract containing 125 acres and 116 acres of the Pamplet tract, and Martha Parker Dyer was allotted 100 acres of the Pamplet tract.

It is conceded that the 125 acre Kindall tract was at the time of the trial worth about $3,000; that the 116 acres of the Pamplet tract set aside to W. F. Parker were worth about $1,200, and the remainder of that tract which was set aside to his sister, something less than that amount. There is no evidence as to the money value of either tract of land at the time the instruments above referred to were executed in 1889. However, one witness who lived in the neighborhood at that time, and who was familiar with both tracts, testified that the Pamplet tract was divided equally between W. F. Parker and his sister on the basis of its value and this is the only evidence there is upon that point.

After the execution of these deeds the sister continued to live with her brother and mother at the "Home Place" on the Kindall tract

until her marriage, when she moved away with her husband. Upon his death about ten years later she returned with her children to the "Home Place" and made her home there with her brother, raising her family on that place until her death in 1937. The mother, Polly Ann Parker, also lived on this place until her death in 1919, without homestead or dower ever having been set apart to her. W. F. Parker seems to have managed all of the land, including that part allotted to his sister in the transaction above mentioned. In short, with the exception of the time that the sister was away with her husband they all lived there as one family until their respective deaths, during which time W. F. Parker seems to have acted as head of the family generally.

We should have stated that the defendant, Arthur Dyer, son of Martha Parker Dyer, who had lived on the Kindall place practically all of his life and who was at the time of the trial evidently past middle age, as he was born prior to the death of L. N. Parker, testified that the Kindall or Home Place tract had always been the more valuable of the two tracts.

■ It is an invariable common law rule that, when an intestate leaves an estate which he acquired by gift, devise or descent from some of his ancestors, and he has no descendants, the estate can be inherited only by persons of ancestral blood. Gantt v. Trott, 107 Md. 325, 68 A., 612; Poisson v. Pettaway, 159 N. C., 650, 75 S. E., 930; Note: 12 Am. St. Rep., 109.

■ An ancestral estate arises where there is no consideration other than blood. If the estate is obtained by any means other than descent, gift or gratuitous devise, then it is a new acquisition and its course of descent is not governed by the common law rule, nor by a statute based thereon.

■ It is very generally held that a true partition among tenants in common of real property which they hold as an ancestral estate— that is, where it came to them by devise, of gift, of an ancestor—does not affect the ancestral character of the tract taken by each. This is held to be true whether the partition is made in a legal proceeding or by deeds of mutual release. Carter v. Day, 59 Ohio St., 96, 51 N. E., 967, 69 Am. St. Rep., 757; other cases are collected in the notes appearing in 103 A. L. R., 231, 39 L. R. A. (N. S.), 955, L. R. A., 1916C, 912, Ann. Cas. 1913E, 1263.

The rationale of this view is that by such a transaction no new estate is acquired and no change in the title occurs. Each of the parties takes his allotment not by purchase but is seized of it as much by descent from the common ancestor as he was by the undivided share before the partition. Cottrell v. Griffiths, 108 Tenn., 191, 65 S. W., 397, 57 L. R. A., 332, 91 Am. St. Rep., 748.

The complainants recognize the rule to be as stated but maintain that it contemplates an equal partition with no consideration passing between the parties which, it is insisted, was not had in the instant

case. They contend that by the transaction W. F. Parker acquired more than a moiety in the land; that a valuable consideration for the excess was given; and that the ancestral character of the excess was thus destroyed so that with respect to it the descendants of the children of the half blood were let in.

As stated in the brief the argument in part is: "in view of the fact that the deeds between W. F. Parker and his sister Martha Parker Dyer recite a consideration of (a) transfer of livestock, (b) assumption of certain debts, and in addition thereto, the proof points to a consideration of (c) support and maintenance of Mrs. Polly Ann Parker for life, and (d) providing a home for Martha Parker Dyer and family should she need one, and such recitals, are recitals of valuable considerations, it is clear that the tract of land involved passed by purchase and not by inheritance." The legalistic basis for this view seems to be supported in principle by very good authority, particularly Ohio cases. See: Huseman v. Fingermeyer, 106 Ohio St., 113, 139 N. E., 862, and case therein cited. See, also, Annotation, 103 A. L. R., 231.

However, since a sister is not an "ancestor" within the meaning of the rule governing the devolution of property acquired by gift, devise or descent from an ancestor, the brother in this case held by purchase rather than by descent any part of the land, title to which he acquired through her conveyance, whether a valuable consideration was paid therefor or not. Spofford v. Rose, 145 Tenn., 583, 237 S. W., 68. The question of whether a valuable consideration passed in this particular instance is important primarily as negativing the idea that the transactions were for the sole purpose of partitioning the ancestral land, and, we think that in the absence of anything to the contrary, the recitations in the two instruments with respect to the nature of the consideration therefor must be regarded as showing that there was an element of bargain and sale in the transactions, and hence that the quitclaim deeds were not true partition deeds but something more.

It remains to be decided whether, in the present plight of the record, it can be determined what portion of the land covered by the instruments executed by Martha Parker Dyer and husband was "acquired" by the intestate from his sister as a result of the consideration expressed in the instrument and what portion he already had title to by descent from his father; for it is conceded that the conveyance added nothing to the title he already had by descent, that is, to one-half interest.

The complainant's argument runs that, since "the Pamplet tract of 216 acres was divided equally so far as valuation was concerned," and since W. F. Parker received in addition to his one-half of the Pamplet tract all of the 125 acre Kindall tract, "there can be little question of the fact that W. F. Parker received by the quit-claim deed of his sister, Martha Parker Dyer, a one-half interest in the Kindall tract over and above the amount of the property he actually inherited from his father."

After very careful consideration we have reached the conclusion that this contention must be sustained.

While, as above stated, there is no evidence in the record with respect to the value of the two tracts of land at the time the deeds were executed it was shown that the Pamplet tract was equally divided from the standpoint of value and there was no effort to show to the contrary. This being true, it cannot be said that so far as the one-half of the Kindall tract owned by the sister is concerned the deed executed by her merely adjusted the rights of the interested parties to the possession, making no new title or changing the degree of title, as is the case with a pure partition deed. Upon the other hand, with respect to that interest the instrument must be regarded as having conveyed the legal title of the sister to W. F. Parker and the valuable consideration there expressed must be regarded as being referable to this phase of that instrument. We see no escape from this conclusion.

The view that the transaction between the brother and sister was not a true partition in the sense that it was intended thereby merely to set aside to each in severalty what each had inherited in common from their father, is fortified, we think, by the argument that the reason the sister's interest in the home tract was conveyed to W. F. Parker was that there might thereby be provided a home for the mother and for the sister in the event that she should at any time thereafter find it necessary to take up her abode there; in short, that it was the purpose to provide permanently a home for the brother, the sister and the mother, leaving it in the charge of the brother. Considering the circumstances of the parties at the time, this is altogether plausible in the light of the evidence, meagre though it is, and is borne out by what happened afterwards, for, as before stated, all of them wound up residing on the Kindall tract as a home.

Not only this, but the averments of the answer strongly tend to support this view. While it is therein denied that W. F. Parker paid a valuable consideration for a one-half undivided interest in the Kimdall tract, and averred that he held title to all of the land in question by descent from his father, and that the instruments hereinabove referred to were pure partition deeds, the significance of the following allegations cannot be escaped in the consideration of the determinative question as to whether there was a pure partition, that is, an equal partition of the land, and so intended: "Defendants aver that the meaning and significance of said deeds is that said L. N. Parker lands were partitioned and the home place was being retained as a home for W. F. Parker and Polly Ann Parker, the mother of W. F. Parker and Martha Parker Dyer; and as a home for the children of Martha Parker Dyer and Bob Dyer, her husband, as will be more fully set out."

Thereafter, in the course of the answer it is averred:

"Your defendants further aver that the 125 acre Kindall tract was held and kept in the name of W. F. Parker as a home for W. F. Parker,

and the mother of W. F. Parker and Mrs. Dyer and the children of Mrs. Dyer and also for Mrs. Dyer at any time the occasion should happen to be necessary, and, that said place was always used for that purpose; that Mrs. Dyer herself lived with . . . her brother for many years prior to his death on the 125 acre Kindall tract; that her children lived there for many years; and her mother lived there until her death, and that the furniture with the exception of a very few articles belonged to Mrs. Dyer and not to W. F. Parker as will be shown more fully in the proof of this cause.''

Moreover, the testimony of one of the defendants, Arthur Dyer, son of Martha Dyer, who was living at the time the instruments were executed, indicates that one purpose in conveying the entire Kindall tract to W. F. Parker was that he might thereby be enabled to maintain a home for all or any of them as and if one was needed, and, as above stated, this is exactly what he did do.

It is perhaps proper to say in this connection that the evidence does not go so far as to indicate that he held in trust the interest conveyed to him in this tract by his sister or that it was intended. No such contention is made.

Upon this phase of the controversy the Chancellor held against the complainants on the ground that the execution of the deed above referred to was ''but a simple division between said parties of said lands,'' meaning that they were pure partition deeds only, resorted to for the purpose of setting aside to each of the parties his or her share in the land in severalty.

For the reasons stated we are unable to concur in this view. As above indicated, our conclusion is that one-half interest in the Kindall tract, of which W. F. Parker died seized and possessed, was not of an ancestral character, having been acquired by him from his sister within the meaning of subsection (2) (a) of Code section 8380, and that its devolution was controlled by that provision of the statute.

This brings us to a consideration of the next question which requires a further statement of the facts.

On October 7, 1894, W. F. Parker conveyed to one Mary Gills 25 acres out of the northeast corner of that portion of the 116 acre Pamplet tract of land which had been allotted to him in the division. The consideration for this conveyance was 50 acres of land, presumably conveyed by Parker's grantee to him. In 1905 Mary Gills re-conveyed to Parker the same 25 acres for a recited consideration of $150 cash. It is no longer controverted, and could not be successfully, that these conveyances, made under the circumstances disclosed, operated to destroy the ancestral character of the 25 acres, and the Chancellor so held. See: Dudrow v. King, 117 Md., 182, 83 A., 34, 39, L. R. A. (N. S.), 955, and note, Ann. Cas. 1918E, 1258, and note. We have referred to this transaction merely to indicate the scope of the decree and to preserve the continuity of the history of the property.

On March 9, 1906, W. F. Parker conveyed to A. J. Freeman by a general warranty deed the 116 acre Pamplet tract for a consideration of $800, evidenced by 3 promissory notes, to secure which a vendor's lien was retained in the deed. Default having been made in the payment of these notes, Parker, on April 9, 1909, filed a bill to enforce his vendor's lien by a sale of the land. In the course of this proceeding the land was duly sold at public sale and bid in by Parker for the sum of $600. A decree was passed divesting the title out of Freeman and vesting it in Parker as purchaser. The complainants insist that this transaction destroyed the ancestral character of the 16 acres therein involved which represented W. F. Parker's portion of the original Pamplet tract, and that the Chancellor erred in not so holding.

The Chancellor's view of the matter is indicated by the following from his opinion: "In support of their insistence that the Pamplet tract was acquired by W. F. Parker, the complainants insist that his sale to Gills and Freeman and the revesting of title in Parker is an acquirement. This is true as to the 25 acres sold Gills and which was repurchased by the complainant, but is not true as to the remaining 91 acres of this tract because in his deed to Freeman he never wholly parted with the title, retaining his interest in said lands until the payment of the consideration which was never made.

"In other words, to hold that the transaction with Freeman completely alienated title from Parker and that the enforcement proceeding against Freeman constituted an 'acquirement' of the property which he inherited from his father would seem rather a strained construction of the intention of the law."

We think that the conclusion reached by the Chancellor was erroneous.

The general rule is that if one who holds by descent conveys his interest away and it be conveyed back to him, he holds thereafter by purchase and not by descent. In 1 Coke on Littleton, 12b; the rule is stated in this language: "If a man be seized of lands as heirs of the part of his mother, and maketh foeffment in fee, and taketh back an estate to him and his heires, this is a new purchase, and if he dyeth with issue, the heires of the part of the father shall first inherit." The authorities, ancient and modern, seem to agree that this is the general rule. Dudrow v. King, supra; Notes: 39 L. R. A. (N. S.), 955, and L. R. A., 1916C, 902, 910.

In Dudrow v. King, supra [117 Md., 182, 83 A., 36, L. R. A. (N. S.), 955], it is said that, "In a more modern work, Broom & Hadley's Commentaries, top page 660, the same doctrine is stated thus: 'If one seized ex parte materna, made a foeffment in fee so as to part with the estate absolutely, and then took a reconveyance, the descent was broken, but, if he made a conveyance for the purpose of creating particular estates and limited the ultimate fee to himself, this was held to be the same estate he had before, and it descended to the heir ex parte

materna. The estate which is taken back must be in reality a new estate, and not merely a part of the old estate, unless it comes within the statute of 3 and 4 William, IV, chap. 106, sec. 1, enacted in 1833'—which changed the rule previously stated, but which is, of course, not in force in Maryland.''

There appears to be no dissent from the view that where a transaction is operative to pass both the legal title and the beneficial use of the land, its ancestral character is destroyed and the grantor in such a transaction is in by purchase rather than by descent if he thereafter acquires the fee; and this is true whether his acquisition is through a private transaction or at a public sale. See 18 C. J., 819; 26 C. J. S., Descent and Distribution, sec. 14.

The argument in support of the Chancellor's conclusion is that ''W. F. Parker did not wholly part with the title to the Pamplet tract in his sale to Freeman retaining his interest in said land until the payment of the consideration, which was never paid, and that the enforcement proceedings did not constitute an acquirement of the Pamplet tract which he inherited from his father L. N. Parker.''

In the instant case the conveyance of the land by Parker to Freeman carried both the legal title and beneficial use. The retention of a lien to secure the payment of the purchase money impaired neither, but operated only to hold the land as collateral for the debt. In this State it has been pointed out that, generally speaking, where an express lien is retained by the vendor in his deed, the relation between him and his vendee is practically that of a mortgagee and mortgagor. Dixon v. Morgan, 154 Tenn., 389, 407, 285 S. W., 558, and cases cited. Cf. Lincoln v. Purcell, 39 Tenn. (2 Head), 143, 73 Am. Dec., 196.

In Lieberman, etc., v. Knight, 153 Tenn., 268, 280, 283 S. W., 450, 453, the Court had under consideration the relation between a mortgagor and mortgagee, and in that connection quoted with approval from Reid v. Bank, 1 Sneed, 262, 274, as follows: ''The mortgagee is considered as a creditor, not owner; and the only interest he has in the land, consists in a lien or security for the payment of his debt. It is a mere chattel interest. The mortgagor may exercise the rights of owner, if he do not commit waste or otherwise impair the security.''

This is, no doubt, equally true as to the respective interests of a vendor and vendee where the former has retained an express lien on the land to secure the purchase money. If there is any difference at all, we would say that in such a case the interest of the vendee is more nearly a complete interest than is that of a mortgagor. This because, theoretically at least, the rule still prevails in this state that a mortgagee not only takes the legal title but is entitled to the possession also. Liberman, etc., v. Knight, supra.

As before stated in the instant case the deed from Parker to Freeman conveyed not only the legal title but the beneficial use and

his right to thereafter dispose of both was absolute. Parker's interest therein was limited to that of a creditor for whose debt the land stood, with the ultimate right to subject so much of it as was necessary to the payment of the obligation. This he did by an appropriate court proceeding, at which he became purchaser. We think that, under the principle announced by the authorities hereinabove referred to, this was a new acquisition and he thereafter held the land by purchase rather than by descent. This would seem to sufficiently appear from the recitals of the decree confirming the sale which divested the title out of Freeman and vested it in Parker. On this account he manifestly thereafter held under Freeman.

As suggested by counsel for the complainant, Parker was under no obligation to purchase at the judicial sale. Another might well have done so. And Parker, for reasons satisfactory to himself, might thereafter have purchased from him. In that event we think it would not even be contended that the transaction had not destroyed the ancestral character of the estate. We perceive no distinction in principle between the supposed case and the actual one. In purchasing at the sale Parker is, for the purposes of this case, to be regarded as any third person would be, that is, as a stranger to the original transaction, and the title and right to the beneficial use which he thereby acquired was a new acquisition and wholly distinct from, and independent of, his previous interest as a lienor, just as much as would be the interest of a third person, had such an one been the purchaser instead of Parker.

The few cases dealing with the principle support this view. They are collected in the annotations hereinabove referred to. To those already mentioned we may add that of Cornett v. Hough, 136 Ind., 387, 35 N. E., 699, one phase of which is in point.

Our conclusion is that the Chancellor erred in holding that the property conveyed to Freeman and purchased by Parker at the judicial sale retained its ancestral character and that the purchase by Parker at the sale did not amount to a new acquisition by Parker so as to let in to the inheritance the complainants as the descendants of the sister of the half blood.

The result is that the Chancellor's decree will be modified so as to accord with the views herein expressed, and in all other respects will be affirmed. The cost of the appeal will be divided equally between the parties; the cost of the Chancery Court will be paid as decreed by the Chancellor. The cause will be remanded for further proceedings in accordance with the prayer of the bill, not inconsistent with the conclusions herein set forth.

Senter and Ketchum, JJ., concur.